\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | |
| NORTHERN VALLEY | * | CIV. 09-1004-CBK |
| COMMUNICATIONS, L.L.C., | * | |
| | * | |
| Plaintiff, Counterclaim Defendant | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | |
| QWEST COMMUNICATIONS | * | |
| CORPORATION, | * | |
| | * | |
| Defendant, Counterclaimant | * | |
| | * | |
| vs. | * | |
| | * | |
| GLOBAL CONFERENCE PARTNERS, | * | |
| | * | |
| Counterclaim Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending are:

1. Qwest Communications Corporation's ("Qwest") motion to compel.[1]
2. Northern Valley Communications, L.L.C.'s ("Northern") motion to compel.[2]
3. Qwest's motion to amend or correct declaration.[3]
4. Northern's motion to seal.[4]
5. Qwest's motion to seal.[5]

---

[1]Doc. 123.

[2]Doc. 126.

[3]Doc. 128.

[4]Doc. 130.

[5]Doc. 138.

6.  Qwest's motion to seal.[6]
　　　7.  Northern's motion to seal.[7]

Central to Northern's motion to compel is its claim that Qwest has been unjustly enriched at Northern's expense.[8]  Northern asserts it originated and terminated long distance calls for Qwest customers but did not receive payment from Qwest.  Northern claims this was inequitable because Qwest collected money for these calls.

Central to Qwest's motion to compel is its claim that it is a victim of Northern's traffic pumping scheme, i.e. Qwest did not choose Northern's services to complete conference calls for Qwest's customers.[9]  Instead Northern paid conference calling companies[10] to attract Qwest customers to use a telephone number belonging to Northern, which in turn triggered a fee for Qwest to use Northern's origination and termination services.

**Qwest's Motion to Compel.**[11]

Qwest's motion asserts:

● Northern refuses to identify all of the Free Calling Service Companies ("FCSCs") who have contacted, interacted or contracted with Northern. Northern refuses to identify the FCSCs other than those which actually used Northern telephone numbers.  The request's full scope

---

[6]Doc. 141.

[7]Doc. 147.

[8]Doc. 1, Count VI.

[9]Doc. 73, p. 12.

[10]Characterized by Qwest as a traffic pumping scheme in which a conference calling company offers free calls, generally long distance, to Qwest's customers on numbers assigned by Northern.  The calls originate or terminate on Northern's system so Northern charges Qwest for accessing Northern's origination and termination services.  Northern and the conference calling company share the access fees paid by Qwest to Northern.

[11]Doc. 123.

is relevant and necessary to several of Qwest's claims, particularly to the question of whether Northern's FCSC arrangements were "end user" customer relationships subscribing to services under its tariffs.

- Northern identifies contractual amendments with its FCSC partners on its privilege log and refuses to produce them. Northern claims they are "settlement agreements" and withholds them as well as documents related to them (i.e., drafts and correspondence). These agreements define the prospective (and potentially historic) relationships between Northern and its FCSCs, which is at the very heart of this lawsuit. This material goes to several claims. The requested documents are relevant and necessary to all of Qwest's claims.

- Northern refuses to produce several non-privileged, public documents because their lawyers provided advice about these public materials. While the advice itself is privileged and protected, the underlying public documents are not. Qwest seeks production of the non-privileged documents, which cannot be shielded from discovery simply by attaching them to privileged emails.

**Northern's Motion To Compel.**[12]

Northern's motion asserts:

Specifically, Northern seeks documents and interrogatory responses relating to its alternative theory of recovery for unjust enrichment, including discovery regarding Qwest's revenues derived from its customers for calls destined to Northern's network. Northern seeks documents regarding Qwest's own practices with regard to issues in this litigation, including revenue sharing practices and concerning the payment and collection of access charges associated with calls directed to Qwest's affiliated conference call provider, Genesys. Northern also seeks documents that Qwest has shared with its potential purchaser, CenturyLink, including statements regarding its analysis of the instant litigation. Finally, Qwest has erroneously claimed that several documents are protected from disclosure as a result of the attorney work product or attorney-client privilege. Northern requests that those documents be produced or reviewed by the Court *in camera* to evaluate Qwest's claims of privilege.

## DECISION

Neither Qwest nor Northern identified the disputed discovery requests by number in their

respective motions to compel.   Both parties submitted hundreds of pages of briefs, exhibits, and

---

[12]Doc. 126.

sworn declarations. The specific references to specific disputed discovery requests are identified within these documents. Because the motions to compel categorize the disputed subjects rather than identify each particular disputed discovery request by number, the rulings are likewise by category rather than by number.

### A. QWEST'S MOTION TO COMPEL.

**1.** **Qwest's motion to compel Northern to identify all Free Calling Service Companies with whom Northern has communicated, interacted or contracted.**[13]

Qwest argues the identity of companies with whom Northern *did not do business* is helpful to prove the free calling service companies with whom Northern *does do business* are not end users. Qwest asserts:

> First, if Northern Valley declined any inquiries from FCSCs (either as brokers for other FCSCs or directly for themselves), this is directly relevant to whether the FCSCs were end users subscribing to Northern Valley's tariffs, or instead were doing business with Northern Valley outside of its tariffs. Only common carrier services can be tariffed, and holding oneself out to provide services indifferently to all potential users is a hallmark of tariffed services.[14]

There are many reasons why people and companies choose to do business with each other. One of the reasons could be the one articulated by Qwest, i.e. that Northern *declined* to do business. But, one can imagine many other reasons which would not tend to prove or disprove the free calling service customer with whom Northern does business is an end user. This discovery request is too broad and only minimally likely to produce relevant or admissible information. When compared to the work Northern would have to accomplish to uncover the identity and contact information for

---

[13]Doc. 124, p. 5, Interrogatory 1.

[14]Doc. 124, p. 15.

every free calling service company with whom Northern has communicated, interacted or contracted directly or indirectly, the burden is too great and the benefit too little. On the other hand, if there are so few free calling service companies that it would not be burdensome for Northern to identify those with whom it *did not do business* despite having communicated, interacted or contracted directly or indirectly, then the burden is not too great for Qwest to conduct its own investigation about those free calling service companies to discover facts tending to prove Northern's current free calling service customers or partners are not end users. Qwest's motion to compel Northern to identify all of the free calling service companies with whom Northern has communicated, interacted or contracted is DENIED.

> ### 2. Qwest's Motion To Compel Northern To Produce Contract Amendments With Free Calling Service Companies, Including Drafts And Communications Relating To Them.[15]

Qwest argues these amendments are

> substantive evidence about whether the FCSCs are end users, and whether Northern Valley is, or is not, delivering calls pursuant to the terms of its switched access tariff. Under the official notes to Rule 408, Qwest is not seeking these documents for a use prohibited by Rule 408(a), and therefore, Rule 408(b) expressly authorizes use of these documents at trial.[16]

These amendments are the result of confidential litigation settlement agreements to which Northern is a party. The pertinent cases have been considered.[17] Qwest has satisfied both the ordinary Rule

---

[15]Doc. 124, p. 6, requests for production 2, 3, 18, 33, and 38.

[16]Doc. 124, p. 24.

[17] *Evansville Greenway and Remediation Trust v. Southern Indiana Gas,* 2010 WL 1737875 (S.D.Ind.); *Evansville Greenway and Remediation Trust v. Southern Indiana Gas,* 2010 WL 779494 (S.D.Ind.); *Southern Shrimp Alliance v. Louisiana Shrimp Ass'n,* 2009 WL 3447259 (E.D.La.)*; Southern Shrimp Alliance v. Louisiana Shrimp Ass'n,* 2009 WL 3447259 (E.D.La.*); Auto-Owners Ins. Co. v. Mid-America Piping, Inc.*, 2008 WL 2570820, (E.D.Mo.); *Multi-Tech Systems, Inc. v. Dialpad.com, Inc.,* 2002 WL 2714 (D.Minn); *Young v. State Farm Mut. Auto. Ins. Co.*, 169 F.R.D. 72 (S.D.W.Va.1996); *Fidelity Federal Sav. and Loan Ass'n v. Felicetti,*

26(b)(1) standard[18] and the heightened standard giving deference to Federal Rule of Evidence 408.[19] Northern has not claimed privilege as a protection from discovery. Northern argues:

> In order to effectuate the terms of those settlement agreements and operate on a forward looking basis, Northern Valley has been obliged to amend the terms of its agreements with the affected conference-calling providers (the "Amendments") to reflect the financial arrangement reached with the IXCs (i.e., to set a new rate at which the conference-calling providers will be compensated for the traffic delivered by the settling carriers). This new rate is the sole content of the Amendments to the conference-calling providers' contracts that Northern Valley has not produced to Qwest, and constitutes confidential information pursuant to the terms of the settlement agreements reached with the relevant IXC.[20]

But Qwest claims that if Northern is either charging different rates to different free calling service companies or off tariff rates[21] then the different rates or off tariff rates tend to prove whether the FCSCs are end users, and whether Northern is, or is not, delivering calls pursuant to the terms of its switched access tariff. That claim is central to Qwest's theories in this litigation. Qwest's motion to compel Northern to produce contract amendments with free calling service companies, including drafts and communications relating to them is GRANTED. Northern may redact from the drafts and communications matters which are protected by the attorney/client privilege. The materials produced must be protected by the Protective Order which is on file and must be "for attorneys' eyes only" unless otherwise ordered by the court.

---

148 F.R.D. 532 (E.D.Pa.1993).

[18]Showing relevance or likely to lead to admissible evidence.

[19]Switching the burden to Qwest rather than holding Northern to the burden of showing an exception from discovery.

[20]Doc. 131, p. 12 (internal citation to record omitted).

[21]Rates lower than the tariff schedule.

### 3. Qwest's Motion To Compel Production Of Public Documents Attached To Privileged E-Mail.[22]

Qwest argues that attaching non-privileged documents to privileged communications does not make the public documents privileged. Otherwise, Qwest argues, fully discoverable material could be shielded from discovery through the simple expedient of conveying copies to his attorney.[23] Northern asserts "all of the disputed e-mails and attachments were selected and forwarded by either Northern Valley or its counsel for the specific purpose of obtaining legal advice or dispensing it."[24] The disputed documents are not in the record. Northern has asserted an attorney/client privilege for all of the disputed documents and a work product privilege for two of them. Qwest identified the attachments it is seeking in its brief by beginning Bates number and description:[25]

```
36336  Ex parte meeting notice
36339  FCC decision
36356  Ex parte filing
36362  AT&T ex parte
36370  AT&T ex parte
36376  Complaint from related litigation
36408  AT&T dispute letter
36410  AT&T dispute letter
36412  R. Buntrock Audit response letter
36416  R. Buntrock Audit response letter
36475  Sprint dispute report
36479  Sprint dispute report
36488  Recent FCC decision
36504  Recent FCC NPRM
```

---

[22]Doc. 124, pp. 11-12.

[23]*Renner v. Chase Manhattan Bank*, 2001 WL 1356192, *5 (S.D.N.Y.).

[24]Doc. 131, p. 20.

[25]Doc. 124, pp. 11-12.

The controlling principles were identified in *Barton*:[26]

> Federal Rule of Civil Procedure 26(b)(1) permits discovery into any nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant information need not be admissible at trial so long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence. . . . There are two well-known exceptions to the liberal discovery rules that are relevant to this discovery dispute: the attorney-client privilege and the work-product doctrine. . . . The party seeking to invoke the attorney-client privilege bears the burden of establishing all of the privilege's essential elements. . . . Nevertheless, simply including an attorney in a communication will not render an otherwise discoverable document protected by the privilege. The courts will not permit the corporation to merely funnel papers through the attorney in order to assert the privilege. . . . E-mails, with sometimes different and multiple recipients and authors, add complexity to the analysis of the attorney-client privilege. . . . . Email strands can span over several days, and they may have many different recipients and authors. Moreover, some e-mails in which counsel are involved may contain factual information, which is not protected by the privilege, while others within the same strand may contain exclusively legal advice. . . .("It is beyond question that the attorney-client privilege does not preclude the discovery of factual information. Only the communications and advice given are privileged; the underlying facts communicated are discoverable if they are otherwise the proper subject of discovery."). . . . The work-product doctrine is a qualified privilege and is "distinct from and broader than the attorney-client privilege. . . . Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative. . . .

But an important competing principle was described in *Hilton-Rorar*:[27]

> Although the assistance of others is often indispensable to the attorney's work, the attorney-client privilege only exists and extends to communications to an attorney's representative if the communication was made (1) in confidence and (2) for the purpose of obtaining legal advice.[28]

> . . .

---

[26]*Barton v. Zimmer, Inc.,* 2008 WL 80647, 3 (N.D.Ind.). Internal citations and quotation marks omitted except for one to show that the quotation within the parentheses is from a case cited by the author of the *Barton* opinion.

[27]*Hilton-Rorar v. State & Fed. Commc'ns Inc*., 2010 WL 1486916, (N.D. Ohio).

[28]*Id.* at *4.

To the extent these e-mails contain attachments or other e-mail communications that are not otherwise independently privileged, the attorney-client privilege nevertheless applies because to order the disclosure of those e-mails would necessarily reveal the substance of a confidential client communication made seeking legal advice. Thus, compelling disclosure would undercut a bedrock principle underlying the attorney-client privilege that is the privilege encourages clients to make full disclosure to their lawyers.[29]

Northern is the party seeking to invoke the attorney-client privilege. Northern bears the burden to establish all of the privilege's essential elements. Northern has represented that these documents "directly reflect the legal issues important to counsel and client."[30] Understanding that a claim of privilege cannot be a blanket claim and, instead, must be made and sustained on a document-by-document basis, the *Hilton-Rorar* Court conducted an *in camera* review of the all of the e-mails listed on Plaintiffs' privilege log.[31] Northern must produce these documents for *in camera* inspection before a ruling can be made. The ruling on this part of Qwest's motion to compel is DEFERRED.

### B. NORTHERN'S MOTION TO COMPEL.

#### 1. Discovery regarding Qwest's revenues derived from its customers for calls destined to Northern's network.

Northern contends that Qwest's revenues are relevant to Northern's unjust enrichment claim.[32] Northern also contends the information it seeks from Qwest *may* be important to evaluate

---

[29]*Id.* at *8.

[30]Doc. 131, p. 20.

[31]*Hilton-Rorar* at *7.

[32]Attachment to Doc. 130, p. 8.

"the parties' damages."[33]  Northern has not cited a case in which this sought after information has

been allowed.

Qwest contends its revenues are not relevant and cites rulings disallowing production of

revenues.[34]  Despite Qwest's assertions that "every known motion to compel the same information"

and that "the IUB case involved virtually identical claims and issues," there is a significant

difference between Northern's motion and the other motions in which the long distance carriers'

---

[33]*Id.*

[34]Doc. 134, p. 6.  (*Order of IUB*, 2008 WL 5235712 ("Data Request Nos. 44-46 ask QCC
to identify the amounts QCC received from each of its long distance customers to carry calls to the
Reasnor exchange. QCC states that it does not maintain this information in a format that makes it
readily available to Reasnor. QCC has asserted that it would require thousands of hours to provide
complete responses to these data requests and the Board finds that this expenditure of effort on
QCC's part would be unduly burdensome for the collection of information for a marginally relevant
issue. Therefore, the Board will deny Reasnor's motion to compel regarding Data Request Nos.
44-46").

*Tekstar Commc'ns Inc. v. Sprint Commc'ns Co. LP*, Civ. No. 08-1130-MJD-SRN, June 18,
2009 (D.Minn).  Opinion attached to Doc. 138 as Ex. 14 and to Doc. 140 as Ex. 23.  Without
questioning Qwest's reason for citing this case, nothing can be found in it which addresses
disclosing revenues received by the long distance carrier.  The opinion addressed production of
settlement agreements, privileged documents, and taking more than ten depositions.  There is
discussion of similar, if not the same, revenue sharing or fee arrangements in the *Tekstar* briefs, e.g.
Doc. 138, Ex. 14, Plaintiff's Memorandum, p. 13.  But, there is enough information in the hundreds
of pages in the multiple briefs, declarations, and exhibits in this case alone without trying to sort
through briefs from other cases.

*Aventure Commc'ns Tech., L.L.C. v. MCI Commc'ns Serv., Inc*., 2008 WL 4280371, *2
(N.D.Iowa).  ("Finally, Aventure seeks information about the revenue Verizon has received from
traffic terminated to Aventure's network. At issue are Interrogatory Nos. 5 and 7 and Request for
Production No. 6. Aventure suspects the revenue information will show that Verizon still makes a
lot of money even after the terminating access charges are considered. (Aventure Brief at 10). The
Court can perceive no obvious relevance of Verizon's revenue receipts to the defense of the traffic
pumping, tariff validity, and Switched Access Services allegations in the counterclaim. The motion
to compel is denied with respect to Interrogatory Nos. 5 and & and Request for Production No. 6.")

revenues were either not relevant or only marginally relevant. Here Northern has a claim for unjust enrichment. The unjust enrichment theory was not addressed in the cases cited by Qwest. Northern's unjust enrichment claim has survived Qwest's motion to dismiss.[35] "When a claim of unjust enrichment is established, the law implies a contract obligating the beneficiary to compensate the benefactor for the value of the benefit conferred."[36] Qwest has represented it does not record the information Northern seeks and that it would take thousands of hours to reconstruct the information. Other fact finders in other cases have determined the effort to produce like information would be burdensome. There are circular arguments in this case about the effect of tariff rates as a complete defense and as a measure of damages. Judge Kornmann said:

> There may be serious doubts as to whether Northern Valley could ever prove the element of inequity. However, to survive dismissal, Northern Valley must allege only enough facts to state a claim to relief that is plausible on its face. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.[37]

Northern's motion to compel production of Qwest's revenues derived from its customers for calls destined to Northern's network is DENIED without prejudice because at this stage the relevance of Qwest's revenues is questionable, probably marginal at best, and the effort to produce the information sought by Northern would be burdensome. Qwest has also asserted the cost to produce the information would be burdensome. Cost shifting may be a consideration if Northern perceives a need to pursue production of Qwest's revenues in the future.

---

[35]Doc. 73. Judge Kornmann distinguished other cases in this District in which Judges Schreier and Piersol have dismissed an unjust enrichment claim. *Id.* p. 9.

[36]Doc. 73, p. 11, the quotation in this opinion is taken from quoted material in Judge Kornmann's opinion, case citation omitted.

[37]Doc. 73, p. 12. Internal quotation marks and citation omitted.

2. **Documents regarding Qwest's own practices with regard to issues in this litigation, including revenue sharing practices and concerning the payment and collection of access charges associated with calls directed to Qwest's affiliated conference call provider, Genesys.**

Northern argues Qwest should produce its own revenue sharing agreements because Qwest does the same thing it complains about Northern doing. Northern contends that constitutes a statement against Qwest's interest and thus is relevant and discoverable.[38] No cases are cited to support the argument.

Qwest argues it has already produced the same materials for South Dakota in another case and has authorized the use of those documents in this case.[39] Qwest also argues the information is not relevant, that it would be unduly burdensome to produce the information, and that the request for production is too broad.[40] Qwest refers to the *Tekstar* case in Minnesota[41].

This case is about the money Northern claims from Qwest. This case is about the legitimacy of Northern's conduct. If Northern's conduct is not legitimate, that Qwest is conducting business the same way does not make Northern's conduct legitimate. The motion is directed to evidence which is not relevant. The request is too broad, i.e. it is directed to Qwest's business relationships which are different from and broader than Northern's relationships with its free calling service companies. Northern's request also is too broad in that it addresses nationwide relationships when

---

[38]Attachment to Doc. 130, p. 13.

[39]Doc. 134, p. 13.

[40]Doc. 134, pp. 14-15.

[41]*Tekstar Commc'ns Inc. v. Sprint Commc'ns Co. LP*, Civ. No. 08-1130-MJD-SRN (D.Minn.)

only South Dakota business relationships are at issue.  The burden and cost to produce the information is too much compared to the benefit to be derived, if any.  Qwest has already provided the same information in another case in South Dakota in which the issues are substantially identical and in which the same lawyers for Northern are also involved.  Northern's motion regarding Qwest's own practices about revenue sharing, payment and collection of access charges associated with calls directed to Qwest's affiliated conference call provider(s) is DENIED.

> **3.** **Documents that Qwest has shared with its potential purchaser, CenturyLink, including statements regarding its analysis of the instant litigation.**

Northern seeks production of "relevant materials" that Qwest or its affiliates have exchanged with CenturyLink, a company with which Qwest intends to merge.  But Northern has not explained why Qwest's expected merger with another company has any relevance to the issues is this lawsuit.

Qwest cites case law about the common interest privilege.[42]  Qwest responded to the disputed discovery request

> . . . .  Qwest's attorney-client privilege and/or work product protection continue to apply to privileged information shared with CenturyLink subject to a confidentiality agreement in merger negotiations and post-merger agreement, based on Qwest and CenturyLink's common legal interest. . . .[43]

Qwest asserts the disputed documents were disclosed to CenturyLink "to consider various risks and anticipated that after a potential merger, the combined company would handle the pending litigation.

---

[42]*Rayman v. American Charter Fed. Sav. & Loan Assoc.*, 148 F.R.D. 647, 654-55 (D.Neb. 1993); *Hewlett-Packard Co. v. Bausch and Lomb Inc.*, 115 F.R.D. 308, 310 (N.D.Cal. 1987); *In re: Regents of University of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996); and *Cargill, Inc. v. LGX, LLC*, 2007 WL 2142355, *2-3 (E.D.Pa.).

[43]Doc. 134, p. 21.

The disclosure was therefore necessary for formulating common legal strategy . . . ."[44] Qwest's refusal is based upon attorney/client privilege and the work product doctrine, from which springs the common interest privilege.

Northern's motion to compel production of documents that Qwest has shared with its potential purchaser, CenturyLink, including statements regarding its analysis of the instant litigation is DENIED. Northern has not demonstrated relevance. Beyond relevance, the documents are protected by the attorney/client privilege and work product doctrine. This issue is different from the earlier ruling about public documents attached to privileged e-mails. Northern has not argued there are non-privileged documents among the privileged communications. Northern has argued that *none* of the communications are privileged and protected from discovery.

> 4.      **Documents[45] that Qwest claims are protected from disclosure as a result of the attorney work product or attorney-client privilege. Northern requests that those documents be produced or reviewed by the Court *in camera* to evaluate Qwest's claims of privilege.**

This part of Northern's motion to compel is the reverse side of the coin from Qwest's motion to compel disclosure of public documents attached to privileged e-mails. Northern argues:

> Qwest has either failed to establish that a communication is privileged or has waived that privilege through its broad distribution of information that may have previously been privileged. Accordingly, Northern Valley requests that the Court either compel the production of the documents identified below or examine those documents in camera to establish whether they are privileged.[46]

---

[44]Doc. 134, p. 23.

[45]Although identified as "documents," this is a different category of documents from those kept in the Clerk of Courts office which are also referred to as "Doc. __."

[46]Attachment to Doc. 130. p. 17.

But this side of the coin is different.  Qwest has supplied enough specific facts to satisfy its burden to establish the privilege which protects the respective document from discovery.[47]  It has gone beyond reliance upon a blanket assertion of the attorney/client privilege or the work product doctrine.  Based on the supplied facts a decision can be made about each disputed document without an *in camera* review.  The rulings follow:

- **Document 950**.

This is a spreadsheet summary analyzing traffic of various Local Exchange Carriers ("LECs").  It was prepared at the request of Qwest's legal department.  It was prepared by a person who is not a lawyer.  His title is Lead Network Planning Engineer.  The spreadsheet was attached to an e-mail to the Manager Network Planning.  Northern contends the spreadsheet was created for ordinary business purposes and might contain facts subject to discovery.[48]  Northern contends it has a substantial need for these facts because it has no other way of knowing what facts Qwest evaluated when it made the decision to withhold payment from Northern.[49]  Qwest represents the spreadsheet was prepared in anticipation of litigation.[50]  Qwest also represents the spreadsheet contains nothing about Northern.[51]  The motion to compel production of document 950 is DENIED.

- **Document 1278.**

---

[47]See the discussion above under in Section A.3. under the heading "Qwest's Motion To Compel Production Of Public Documents Attached To Privileged E-Mail.

[48]*Lindley v. Life Investors Insurance Co. of America*, 2010 WL 1741407 (N.D. Okla).

[49]Attachment to Doc. 130, p. 19.

[50]Doc. 134, p. 31.

[51]Doc. 134, p. 31.

This is an e-mail "reflecting conversation between Qwest Legal Department and client regarding request to restrict termination from certain carriers."[52] A Staff Engineer drafted the e-mail which was sent to the Network Routing Team.[53] Northern asserts the e-mail is not protected by the attorney/client privilege because the privilege extends only to communications that were made to secure legal advice.[54] Additionally, a corporation waives the privilege if a privileged communication is shared with persons who do not have a corporate responsibility regarding the subject matter of the communication.[55] Qwest represents the e-mail included only persons who were communicating in anticipation of litigation to identify questions to ask legal counsel and that each person who received or sent the e-mail possessed a pertinent job responsibility.[56]

> [T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.[57]

The work product doctrine applies to mental impressions of lawyers and non-lawyers alike.[58] Document 1278 is protected by the work product doctrine. Northern's motion to compel production of document 1278 is DENIED.

---

[52]Attachment to Doc. 130, p. 19.

[53]Attachment to Doc. 130, p. 19.

[54]*Ellenberg v. Tuffy's Div. of Starkist Foods, Inc*., 1985 WL 1559, at *5 (D. Minn).

[55]*Id.*

[56]Doc. 134, p. 32.

[57]*Simon v. G.D. Searle & Co*., 816 F.2d 397, 401 (8th Cir.1987).

[58]*Id.* at 407.

- **Documents 1942 & 1944**.

These are e-mails "reflecting communication between Qwest Legal Department and client regarding request to modify terms with wholesale carriers."[59]  Document 1942 was authored by the Manager Network Ops, and document 1944 was authored by a Staff Engineer.[60]  Northern argues the e-mails are not protected by the attorney/client privilege, but does not address the work product doctrine.  Qwest has lumped its discussion about these two e-mails together with its discussion about documents 1278, 2034, and 2035.  Qwest represents documents 1942 and 1944 included only persons who were communicating in anticipation of litigation to identify questions to ask legal counsel and that each person who received or sent the e-mails possessed a pertinent job responsibility.[61]  Documents 1942 and 1944 are protected by the work product doctrine.  Northern's motion to compel production of documents 1942 and 1944 is DENIED.

- **Document 1945**.

This is an e-mail between two non-attorneys "reflecting communication between Qwest Legal Department and client regarding investigation of independent company access arbitrage."[62]  Counsel for Qwest represents the e-mail was prepared jointly by him and in-house legal counsel describing the results of their investigation into traffic pumping.[63]  The document was prepared for

---

[59]Attachment to Doc. 130, p. 21.

[60]Attachment to Doc. 130, p. 21.

[61]Doc. 134, p. 32.

[62]Attachment to Doc. 130, p. 21.

[63]Doc. 134, p. 32.

the specific purpose of recommending commencement of litigation.[64] Document 1945 is protected from discovery by both the attorney/client privilege and the work product doctrine. Northern's motion to compel production of document 1945 is DENIED.

- **Document 1975.**

This is an e-mail "reflecting conversation between attorney Tana Simard-Pacheco and client regarding withholding payment of certain termination charges."[65] Qwest represents the e-mail contains legal advice from in-house lawyers, relates to an Iowa local exchange company (not Northern), and was prepared "because of the prospect of litigation."[66] Northern's motion to compel production of document 1975 is DENIED. It is protected from discovery by both the attorney/client privilege and the work product doctrine.

- **Document 2011**.

This is an e-mail between two non-attorneys "reflecting communication between Qwest Legal Department and client regarding team to address access arbitrage."[67] Northern asserts the e-mail pre-dates the commencement of litigation by such a long time that the e-mail could not have been produced in anticipation of litigation, so it must have been produced in the ordinary course of business.[68] Qwest lumps together documents 2011, 2147, and 2293 for discussion. Qwest represents:

---

[64]Doc. 134, p. 32.

[65]Attachment to Doc. 130, p. 22.

[66]Doc. 134, p. 33.

[67]Attachment to Doc. 130, p. 22.

[68]Attachment to Doc. 130, p. 22-23.

Each of these Qwest internal emails arose from an email of Ms. Hensley Eckert in mid-November, 2006, which initiated Qwest's first large-team investigation for providing information to in-house counsel so they could give legal advice to Qwest because of the prospect of litigation against traffic pumpers. These emails all ensure the legal advice was reaching the appropriate individuals within Qwest. These emails thus are both attorney-client privileged and contain attorney work product protected material (in-house counsel's legal advice in anticipation of litigation against traffic pumpers).[69]

Document 2011 is protected from discovery by both the attorney/client privilege and the work product doctrine. Northern's motion to compel production of document 2011 is DENIED.

- **Documents 2034 & 2035**.

These are e-mails "reflecting communication between Qwest Legal Department and client regarding request to exercise rights with BellSouth, Broadwing, Level 3 and Global Crossing numbers" and "summary regarding request to exercise rights with BellSouth, Broadwing, Level 3 and Global Crossing prepared at attorney request.[70] Northern refers to its arguments about documents 1942 and 1944 to support its motion to compel. Northern's motion to compel production of documents 2034 and 2035 is DENIED for the same reasons as production of documents 1942 and 1944 were denied.

- **Documents 2135, 2136, 2147**.

These are e-mails "reflecting conversation between attorney Robert McKenna and client regarding South Dakota Intermediate Tandem."[71] Northern asserts the e-mail pre-dates the commencement of litigation by such a long time that the e-mail could not have been produced in

---

[69]Doc. 134, p. 33.

[70]Attachment to Doc. 130, p. 23.

[71]Attachment to Doc. 130, p. 23.

anticipation of litigation, so it must have been produced in the ordinary course of business. Northern also asserts the facts contained within the e-mails should be produced even if the e-mails themselves are privileged.[72] Qwest represents:

> These are Qwest internal emails sent to Qwest's in-house counsel, with questions regarding the legal ownership of Splitrock, one of the traffic pumping carriers. These emails follow earlier emails between senior managers (not challenged) and specifically discuss the legal advice from Mr. McKenna. These documents were prepared at the direction of and in communication with counsel for the specific purpose of initiating litigation against Splitrock.[73]

Documents 2135 and 2136 are protected from discovery by both the attorney/client privilege and the work product doctrine. Northern's motion to produce documents 2135 and 2136 is DENIED.

- **Document 2293**.

This is an e-mail "reflecting conversation between attorney Robert McKenna and client regarding access arbitrage."[74] Northern offers the same reasons as were offered to support production of documents 2135, 2136, and 2147.[75] For the reasons represented by Qwest which are quoted above in connection with the ruling on document 2011, Northern's motion to compel production of document 2293 is DENIED.

- **Documents Q050191 - Q050196.**

---

[72]Attachment to Doc. 130, p. 24.

[73]Doc. 134, p. 33-34.

[74]Attachment to Doc. 130, p. 24.

[75]Attachment to Doc. 130, p. 24.

These are "minutes of Qwest Board of Directors Meeting."[76] Given Qwest's description on the privilege log, Northern is unsure why the minutes qualify for attorney/client or work product protection.[77] Qwest represents:

> The custodians identified for each of these documents are in-house counsel at Qwest. In each document, lawyers provide significant legal advice, which the Board implements. Every aspect of these documents that concern traffic pumping are both privileged legal advice and contain the mental impressions of the respective lawyers. Thus, each of these documents is on the privilege log because it contains the legal advice given to respectively the audit committee of the board of directors and the board of directors, regarding Qwest's ongoing traffic pumping cases, and is protected by the attorney work product doctrine.[78]

Documents Q050191 - Q050196 are protected from discovery by both the attorney/client privilege and the work product doctrine. Northern's motion to compel production of documents Q050191 - Q050196 is DENIED.

## ORDER

It is ORDERED:

1.      Qwest's motion to compel (Doc. 123) is GRANTED in part, DENIED in part, and DEFERRED in part as follows:

    (a).      Qwest's motion to compel Northern to identify all of the free calling service companies with whom Northern has communicated, interacted or contracted is DENIED.

    (b).      Qwest's motion to compel Northern to produce contract amendments with free calling service companies, including drafts and communications relating to them is GRANTED. Northern may redact from the drafts and communications matters which are protected by the attorney/client privilege. The materials produced must be protected by the Protective Order which is

---

[76]Attachment to Doc. 130, 24.

[77]Attachment to Doc. 130, p. 24.

[78]Doc. 134, p. 34.

on file and must be "for attorneys' eyes only" unless otherwise ordered by the court.

(c). Qwest's Motion To Compel Production Of Public Documents Attached To Privileged E-Mail is DEFERRED. Northern must produce these documents for *in camera* inspection before a ruling can be made.

2. Northern's motion to compel (Doc. 126) is DENIED and DENIED WITHOUT PREJUDICE as follows:

(a). Northern's motion to compel production of Qwest's revenues derived from its customers for calls destined to Northern's network is DENIED without prejudice.

(b). Northern's motion to compel regarding Qwest's own practices about revenue sharing, payment and collection of access charges associated with calls directed to Qwest's affiliated conference call provider(s) is DENIED.

(c). Northern's motion to compel production of documents that Qwest has shared with its potential purchaser, CenturyLink, including statements regarding its analysis of the instant litigation is DENIED.

(d). Northern' motion to produce the each of the disputed documents from Qwest's privilege log is DENIED.

3. Both Qwest's (Doc. 123) and Northern's (Doc. 126) motions for fees and expenses as sanctions against the other are DENIED. There existed sufficient legitimate justification about the disputes for each party to take the positions taken by each party.

4. Qwest's motion to amend or correct declaration (Doc. 128) is GRANTED.

5. Northern's motion to seal (Doc. 130) is GRANTED.

6. Qwest's motion to seal (Doc. 138) is GRANTED.

7. Qwest's motion to seal (Doc. 141) is GRANTED.

8. Northern's motion to seal (Doc. 147) is GRANTED.

Dated September 10, 2010.

BY THE COURT:

s/John E. Simko

_____
John E. Simko
United States Magistrate Judge