UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

**FILED**
JUN 20 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| NORTHERN VALLEY COMMUNICATIONS, L.L.C., | |
| Plaintiff, | 1:09-CV-01004 |
| -vs- | ORDER AND OPINION |
| QWEST COMMUNICATIONS CORPORATION, | |
| Defendant, | |
| -vs- | |
| GLOBAL CONFERENCE PARTNERS, | |
| Involuntary Plaintiff. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff, a competitive local exchange carrier ("LEC"), brought this diversity action to collect for amounts allegedly due from defendant, a long-distance carrier or interexchange carrier ("IXC"), for providing originating and terminating telephone access services. Plaintiff alleged breach of contract and breach of implied contract arising out of federal and state tariffs, for violations of the Communications Act ("the Act"), 47 U.S.C. §§ 201 and 203, for a collection claim pursuant to its state tariff, and for unjust enrichment.

On September 29, 2010, this court granted plaintiff's motion to stay this action for the purpose of referring key issues to the Federal Communications Commission ("FCC"), namely: (1) whether plaintiff is entitled to collect interstate switched access charges it has billed to defendant pursuant to plaintiff's tariff for calls to free calling providers; (2) if plaintiff is not entitled to collect switched access charges for these billings, determination of the proper classification of these services and whether plaintiff is entitled to any compensation for these services; and (3) if plaintiff is not entitled to collect switched access charges for these billings,

1

yet is entitled to compensation for those services, determination of a reasonable rate for those services.

Nearly a year and a half after the order and without final FCC action on the referral, defendant requested this court to vacate its stay pending referral, consolidate this proceeding with N. Valley Commc'ns, L.L.C. v. Qwest Commc'ns Co. (N. Valley II), No. 11-04052—a similar case presided over by Judge Karen E. Schreier—and assign both cases to one judge. After defendant's motion, Judge Schreier issued an order to stay the aforementioned proceeding and to refer issues to the FCC, this in the face of opposition by plaintiff and defendant. N. Valley II, 2012 WL 996999 (D.S.D. March 23, 2012). Plaintiff and involuntary plaintiff ("Global") filed a joint response to defendant's motion. In light of Judge Schreier's order, defendant replied and withdrew without prejudice its request for consolidation or assignment to one judge. It maintained its request to vacate the stay. Defendant contends that binding FCC precedents delivered since this court's referral are comprehensive enough that all issues referenced in the stay order have been addressed by the FCC, making further delay unnecessary. Defendant believes it is now proper for this court to decide this case.

I.  BACKGROUND

   A.  **Status of Similar Cases in the District**

This case shares similar issues with ten other cases filed in the District of South Dakota. Each of these cases involve LECs engaging in "access stimulation," which involves a LEC partnering with a conference service company by assigning the company use of the LEC's local telephone numbers, thereby placing their service upon the LEC's local infrastructure for the purpose of call termination, even if the service is physically located far from the LEC's service area. When a customer of a long-distance carrier, otherwise known as an interexchange carrier ("IXC"), calls a conference service company, the LEC bills the IXC an access fee, claiming to have provided a service to the IXC. The resulting fee is then split between the LEC and the conference service company in an arranged revenue sharing agreement. In this way, LECs "artificially inflate their traffic volumes to increase [intercarrier compensation] payments."

2

Connect America Fund; A National Broadband Plan for Our Future, 76 Fed. Reg. 73830, 73832 (Nov. 29, 2011). For some of these conference service companies who advertise their services as "free" to customers, their only discernible revenue for their services has been their portion of shared fee payments. These companies may not actually pay the LEC for obtaining the LEC's phone numbers, with the LEC instead receiving "payment" from their portion of the shared fees obtained from the IXCs. Defendant and other IXCs call what has been happening "traffic pumping."

Of the ten other cases in the District of South Dakota, six are currently stayed for the purpose of referring issues of proper compensation and classification of these services. The referrals have been made to the FCC (for interstate transfers) or the South Dakota Public Utilities Commission ("SDPUC") (for intrastate transfers). N. Valley Commc'ns, L.L.C. v. Sprint Commc'ns Co., No 11-4053, 2012 WL 997000 (Mar. 23, 2012) (refer to FCC); N. Valley Commc'ns, L.L.C. v. Qwest Commc'ns Co., No. 11-4052, 2012 WL 996999 (Mar. 23, 2012) (refer to FCC); Sprint Commc'ns Co. v. Native Am. Telecom, L.L.C., No. 10-4110, 2012 WL 591674 (Feb. 22, 2012) (refer to FCC); Splitrock Props., Inc. v. Qwest Commc'ns Corp., No. 08-4172, 2010 WL 2867126 (July 20, 2010) (refer to FCC); N. Valley Commc'ns, L.L.C. v. Sprint Commc'ns Co., No. 08-1003 (May 26, 2010) (refer to FCC and SDPUC); Sancom, Inc. v. Qwest Commc'ns Corp., No. 07-4147, 2010 WL 960005 (Mar. 12, 2010) (refer to FCC). Two cases have settled, namely Splitrock Props., Inc. v. Sprint Commc'ns Co., No. 09-4075 (Sept. 13, 2011), and Sancom, Inc. v. AT&T Corp., No. 08-4211 (July 14, 2010). One case involves a defendant who has settled but the third party defendants are seeking costs and attorney's fees as a condition for accepting the stipulation for dismissal. Sancom, Inc. v. Sprint Commc'ns Co., No. 08-1003. One case is currently in the discovery phase. N. Valley Commc'ns, L.L.C. v. MCI Commc'ns Servs., Inc., No. 07-1016 (Dec. 22, 2011).

### B. Developments Since the Court's Last Order

Since the order of September 29, 2010, the parties have updated this court on the status of the referred proceeding before the FCC and upon any activities conducted between the parties. The FCC has not acted on the referred issues. There was some discussion that once a plan for

3

discovery was established in a similar case between plaintiff and Sprint Communications Company L.P. ("Sprint"), defendant could participate in that discovery process. Subsequent reports fail to indicate the progress of discovery between the parties.

While the FCC has not acted on the referred issues, plaintiff has sought and obtained a revision of its tariffs to formalize access stimulation services with a switched access rate assessed against IXCs. This process began on July 8, 2010, when plaintiff filed its Tariff No. 3 with the FCC. This tariff was meant to respond to the FCC's decision in Qwest Commc'ns Corp. v. Farmers and Merchants Mut. Tel. Co. (Farmers II), 24 FCC Rcd. 14801 (Nov. 24, 2009), pet. for recons. denied, 25 FCC Rcd. 3422 (2010), pet. for rev. denied, 668 F.3d 714 (D.C. Cir. 2011), which established what plaintiff characterizes as a "fact-specific test." In that case, the FCC found that Farmers' tariff defined the conference call providers (with which Farmers—the LEC—had revenue sharing agreements) as not being "end users" for whose services IXCs may be charged switched access fees by Farmers. Id. at 14806–14808. Farmers then argued that the Communications Act, 47 U.S.C. § 151 et seq., and FCC rules support its theory of what constitutes switched access, even if the conference service companies are not defined as end users under the tariff. The FCC found, however, that Farmers is bound by the terms of its tariff as to whether the tariff definition is narrower than that used in the Communications Act or FCC rules. Id. at 14812. As a result, Farmers could not receive switched access fees for these services under its tariff.

On June 7, 2011, the FCC granted defendant's formal complaint against plaintiff's Tariff No. 3 as written at the time. Qwest Commc'ns Co. v. N. Valley Commc'ns, L.L.C. (Northern Valley I), 26 FCC Rcd. 8332 (June 7, 2011), pets. for recons. denied, 26 FCC Rcd. 14520 (2011). Broadening its fact-specific test in the Farmers II decision, the FCC noted that even though plaintiff expanded its definition of "End User" by stating that "an End User need not purchase any service provided by [plaintiff]," FCC rules override the tariff language and require that tariffed competitive LEC charges for switched access services must be for services that are at least "the functional equivalent" of traditional switched access services. Id. at 8336 (citing 47 C.F.R. § 61.26). The FCC noted that FCC rules define a switched access service's "functional

4

equivalent" to include when a competitive LEC such as plaintiff transmits the call "to its own end user." Id. A competitive LEC's "own end users," by FCC definition, "do not include entities that receive free services from the [competitive] LEC." Id. at 8336–8337. The FCC also asserted that tariff language must comply with the Communications Act and FCC rules and orders. Id. at 8339. Thus, plaintiff was directed to revise its tariff. Id. at 8340.

On June 14, 2011, plaintiff filed revisions to Tariff No. 3 in response to Northern Valley I. On the complaints of defendant and Sprint, the FCC rejected these revisions made under Transmittal No. 5. N. Valley Commc'ns Revisions to FCC Tariff No. 3, WCB/Pricing File 11-07, DA 11-1132 (F.C.C. June 28, 2011), available at http://hraunfoss.fcc.gov/edocs_public/ attachmatch/ DA-11-1132A1.pdf. The revisions involved the modification of two definitions. First, plaintiff attempted to modify its definition of "Customer of an Interstate or Foreign Telecommunication Service" by deleting the phrase "without regard to whether and how much payment is tendered to either the Company or the Buyer for interstate or foreign Telecommunications service" and replacing it with "for a fee." Id. ¶ 2. Second, plaintiff attempted to revise its definition of "End User" by deleting the final sentence in the definition, which read: "[a]n End User need not purchase any service provided by the Company." Id. The FCC found that these changes still conflicted with Northern Valley I, id. ¶ 4, since the language changes were not "clear and explicit" in their conformance with Northern Valley I. Id. ¶ 6. Qwest argued this ambiguity was explained by the fact that, since the definition of "Customer" is a component part of the definition of "End User," and a person becomes a customer merely for paying a fee for potentially any telecommunications service under plaintiff's definition, that a caller seeking conference services under an access stimulation arrangement might only need to pay a fee for any telecommunications service (for example, a fee to its long-distance provider) to vest a conference service company with end user status warranting payment of switched access charges under the tariff. Id. Sprint asserted that this language could "be interpreted to mean that the IXC's payment of access charges qualifies as the 'fee' for transmission across Northern Valley's network." Id. The FCC found that these particular provisions may be interpreted as

5

Qwest and Sprint suggested and, because these revisions were ambiguous, they must be revised again. Id. ¶¶ 9–10.

On July 18, 2011, the FCC released its opinion and order granting in part and denying in part a formal complaint made by Sprint against plaintiff's Tariff No. 3. Sprint Commc'ns Co. v. N. Valley Commc'ns, L.L.C., 26 FCC Rcd. 10780. Echoing the reasoning in the June 28, 2011, order, the FCC directed plaintiff to again revise a portion of its tariff. Id. at 10780-81.

On July 26, 2011, plaintiff filed changes to Tariff No. 3 in keeping with the FCC's orders. Qwest filed its petition to suspend or reject the tariff on August 2, 2011. The FCC rejected Qwest's petition, and Tariff No. 3 as revised was deemed lawful and effective on August 10, 2011. Protested Tariff Transmittal Action, 26 FCC Rcd. 11282, 11282 (Aug. 12, 2011). This approved tariff contains within the definition of "End User" the requirement that an End User "must pay a fee to [plaintiff] for telecommunications service." In response to Sprint's concerns, the definition further provides that "[o]ther carriers, including IXCs, are not considered to be End Users under the terms of this Tariff, unless [plaintiff] consents to such classification in writing." N. Valley Commc'ns, L.L.C., Access Service Tariff, FCC Tariff No. 3, at 8 (last revised Jan. 21, 2012). Additionally, this tariff clarifies that a "Customer of an Interstate or Foreign Telecommunications Service . . . must pay a fee <u>to [plaintiff] for telecommunications service</u>," presumably in response to defendant's concerns. Id. at 7 (emphasis added). However, plaintiff explicitly includes "conference call providers" and "chat line providers" within this definition, reinforcing the importance of the term as a component part of the definition for "End User." This tariff also contains a definition of "Volume End User" or "VEU" as:

> An End User that obtains Service from [plaintiff] in order to provide high-traffic services, including, but not limited to, chat line services, conference calling services, help desk assistance, or call center support, designates [plaintiff's] central office as its [End User Designated Premises or EDP], and accordingly, installs equipment in the [plaintiff's] central office.

Tariff No. 3 at 10. Plaintiff asserts that this definition is purposely meant to include conference calling and similar services, which are absent from the "End User" definition. Northern Valley

6

also states that, unlike the definition of "End User," this definition contains no requirement that the VEU pay a fee to plaintiff for a "telecommunications service." Thus, plaintiff created this special category in order to incorporate access stimulation-related services into its service fees under the tariff. Plaintiff also asserts that the corresponding rate for VEUs is "well below the rate that [plaintiff] could have assessed under the FCC's benchmarking rules then in effect for rural [competitive] LECs."

### C. The FCC's Compensation Regime for Access Stimulation

The FCC began addressing the compensation regime for access stimulation in its rulemaking of November 29, 2011. Connect America Fund; A National Broadband Plan for Our Future (the Rulemaking), 76 Fed. Reg. 73830, 73832 (to be codified at 47 C.F.R. pts. 0, 1, 20, 36, 51, 54, 61, 64, and 69). In short, the rules require that a LEC must refile their interstate switched access tariffs at lower rates if access stimulation is occurring. The FCC provides two criteria that together indicate that access stimulation exists: (1) a LEC has a revenue sharing agreement and (2) the LEC either has (a) a three-to-one ratio of terminating-to-originating traffic in any month or (b) experiences more than a 100 percent increase in traffic volume in any month measured against the same month during the previous year. Id.

## II. DISCUSSION

This court entered a stay to defer dispositive issues that required the expertise and experience of the FCC under the doctrine of primary jurisdiction. This doctrine applies to "claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." United States v. Rice, 605 F.3d 473, 475 (8th Cir. 2010) (quoting Reiter v. Cooper, 507 U.S. 258, 268 (1993)). While no fixed formula exists for applying the doctrine, a court must decide whether the purposes served by the doctrine "will be aided by its application in the particular litigation." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956). These purposes include

7

the need for policy uniformity on the issue and the potential for a superior legal outcome in the courts when administrative agencies use their expertise and more flexible procedures. *See* id. at 64–65. Nevertheless, the doctrine is to be "invoked sparingly, as it often results in added expense and delay." Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 938 (8th Cir. 2005) (internal quotations omitted).

In order to now vacate this stay, the purposes of the primary jurisdiction doctrine must no longer be aided by the continuing referral to the FCC. Examples of courts of appeal who rejected the application of primary jurisdiction referral by district courts are instructive here. In Alpharma, the Eighth Circuit rejected the application of the primary jurisdiction doctrine because the issue referred by the district court could have been resolved by interpreting materials clearly displayed in the Federal Register and Code of Federal Regulations. Id. at 939. In F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48 (2d Cir. 2006), the Second Circuit affirmed the district court's refusal to refer the case to the FCC, noting that (1) many FCC precedents existed on what the terms "information service" and "telecommunications service" meant, (2) the terms were not so abstract as other statutory terms such as "reasonable" or "public interest," and (3) there is no danger of inconsistent rulings on the definition of these terms. Id. at 60–61.

Defendant contends that this court may apply existing FCC precedent to definitively answer each of the three questions posed by the court in its referral. On the first issue, whether plaintiff is entitled to collect switched access fees it has charged defendant in accordance with its tariff, defendant believes the issue is no longer in doubt with the FCC's decisions in Qwest Commc'ns Co. v. N. Valley Commc'ns, L.L.C. (Northern Valley I), 26 FCC Rcd. 8332 (June 7, 2011), and Sprint Commc'ns Co. v. N. Valley Commc'ns, L.L.C., 26 FCC Rcd. 10780 (July 18, 2011). Defendant argues that each stands for the principle that the only calls for which plaintiff may recover switched access fees through its tariff are those calls delivered to an end user who purchased an interstate telecommunications service from the plaintiff; otherwise plaintiff may only recover such fees through a negotiated contract with the IXCs. Since plaintiff admits that it did not charge the conference service companies for an interstate telecommunications service,

defendant contends that the conference service companies were not end users and thus the switched access tariff does not cover the calls. With no contract between plaintiff and defendant covering these services, defendant argues that plaintiff is not entitled to any compensation, thereby addressing the second and third issues for referral.

The problem is that the progression of FCC precedent from Farmers II through Northern Valley I and Sprint is at the very least interrupted by the Rulemaking. Instead of reasserting the prohibition against access stimulation being charged under the switched access fee, the Rulemaking simply requires that "[c]arriers who meet the definition of access stimulation will generally be required to file revised tariffs to account for the change in the volume of their traffic." Rulemaking, 76 Fed. Reg. at 73847. The FCC states explicitly that "[o]ur revised interstate access rules generally require competitive carriers and [LECs] to refile their interstate switched access tariffs at lower rates" if the carrier is found to engage in the practice of access stimulation. Id. at 73832. While a much more technical interpretation of this language from the FCC would be preferable, common sense dictates that the text shows the FCC wants rates to be lowered for the purpose of accounting for (which translates into including) switched access fees derived from access stimulation, contrary to defendant's interpretation. If it is the FCC's policy that the charges associated with the practice of access stimulation are not to be assessed as fees under the tariff at all, why then require LECs to lower a rate because of access stimulation? With no fees assessed for access stimulation-related services, there is no need for LECs to refile their tariffs with lower rates, since they receive no benefit from this "harmful" practice. While this court is not a diviner of FCC intent, this casts sufficient doubt against the idea that the FCC has found that access stimulation charges may never be assessed under the tariff in any fashion, as defendant alleges. The FCC's denial of defendant's petition to reject or to suspend and investigate Tariff No. 3 as filed on July 26, 2011, also casts doubt on defendant's interpretation.

As noted by Judge Schreier, the Rulemaking does not state that it is retroactive, and this court should not assume that it is so. N. Valley II, 2012 WL 996999, at *5 (citing Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988)). Since the charges referenced in the

9

complaint occurred before the Rulemaking became effective, the Rulemaking does not directly apply to settle the issues currently on referral. However, it shows that some inconsistencies exist in the FCC's treatment of access stimulation-related fees which cannot be resolved by a perusal of the C.F.R. or Federal Register and which involve technical concerns within the scope of the FCC's expertise and experience. These are sufficient justifications at this time to warrant a continuation of the stay for referral purposes. See W. Pac. R.R. Co., 352 U.S. at 64–65; Alpharma, 411 F.3d at 939.

This opinion also reinforces the need for the FCC to provide clarity to the courts on how access stimulation-related fees incurred before the Rulemaking became effective might be assessed within a rate framework, if at all. Such a finding is better within the purview of the FCC. Since the FCC has not acted on the first issue referred by this court, defendant's motion to vacate the stay for referral to the FCC should be denied.

The only consistent theme connecting Farmers II and the Rulemaking appears to be that LECs should receive some form of compensation for access stimulation-related services. See Farmers II, 24 FCC Rcd. at 14812 n.96 ("This is not to say that Farmers is precluded from receiving any compensation at all for the services it has provided to Qwest."); cf. Farmers & Merchants Mut. Tel. Co. v. FCC, 668 F.3d 714, 723–24 (D.C. Cir. 2011) (leaving open the possibility that Farmers may be compensated for services associated with access stimulation). Previous decisions such as Farmers II must be read as complementary to the Rulemaking. Connect America Fund, 27 FCC Rcd. 605, 613 (Feb. 3, 2012). Thus, it seems unlikely that the FCC foreclosed any compensation for services plaintiff provided outside of the tariff or a negotiated contract, as defendant argues. It is within the unique competence of the FCC to determine what compensation, if any, plaintiff may receive for these access stimulation-related fees and, for what period of time if the fees are legal. Since this determination has yet to be made, defendant's motion to vacate the stay for referral to the FCC of issues two and three should also be denied.

The FCC is strongly urged to act in a timely manner and with sufficient clarity to be of assistance to the courts and the parties.

### III. ORDER

Based upon the foregoing,

IT IS ORDERED that defendant's motion, Doc. # 171, to vacate stay pending referral is denied.

Dated this /9th day of June, 2012.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
                    DEPUTY
(SEAL)